UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION



UNITED STATES OF AMERICA,

     Plaintiff,

v.                                    Case No. 8:25-cv-01728-JLB-NHA

PEYMON MOTTAHEDEH and
APRIL L. MOTTAHEDEH,

     Defendants.

---

PEYMON MOTTAHEDEH,

     Counterclaim Plaintiff,

v.

UNITED STATES OF AMERICA;
JOHN BLACK, in his individual capacity;
KIRK PARBONINI, in his individual capacity; and
PAUL VON RAVENSBERG, in his individual capacity,
SUE GARY, in her individual capacity,
DEE RODRIGUEZ, in her individual capacity,
JOSE MARTINEZ, in his individual capacity,
TERESA PECK, in her individual capacity,
FRANK P. NIXON, in his individual capacity,
MARYNELL STEBURG, in her individual capacity,
CHRISTIANE THAI, in her individual capacity,
JOHN CONSOLI, in his individual capacity,
JOHN and JANE DOES Nos. 1-100, in their individual capacities,

     Counterclaim Defendants.

Page 1

## DEFENDANT PEYMON MOTTAHEDEH'S FIRST AMENDED ANSWER, AFFIRMATIVE DEFENSES, AND COUNTERCLAIMS

Defendant Peymon Mottahedeh (hereafter, "Defendant"), proceeding *pro se*, hereby responds to the Plaintiff's Complaint, asserts Affirmative Defenses, and asserts Counterclaims as follows:

### PART I: TIMELINESS OF AMENDMENT

Pursuant to Fed. R. Civ. P. 15(a)(1)(A), a party may amend its pleading once as a matter of course within "21 days after serving it." Defendant/Counterclaim Plaintiff Peymon Mottahedeh served his initial Answer, Affirmative Defenses, and Counterclaims on April 24, 2026. Because this First Amended Answer, Affirmative Defenses, and Counterclaims is being filed on May 15, 2026 within the 21-day statutory deadline, it is timely filed as a matter of right, and no leave of Court is required.

### PART II: ANSWER TO THE COMPLAINT

### I. GENERAL RESPONSE

Pursuant to Fed. R. Civ. P. 8(b), Defendant denies each and every allegation of the Complaint except those expressly admitted below.

## II. RESPONSES TO NUMBERED PARAGRAPHS

- **Paragraph 1:** Admits that this action purports to seek to reduce alleged federal tax liabilities to judgment, but denies the validity, enforceability, and amount of any such liabilities.

- **Paragraph 2:** Denies for lack of knowledge or information sufficient to form a belief about the truth of these allegations.

- **Paragraph 3:** Admits that the Complaint invokes federal jurisdiction statutes but denies that Plaintiff is entitled to the relief requested.

- **Paragraph 4:** Admits he resides in Hernando County, Florida and that Hernando County is in the Middle District of Florida. Defendant denies having residence in the Tampa Division. Defendant asserts that venue in the Tampa Division is improper and reserves all rights to seek transfer or other appropriate relief.

- **Paragraph 5:** Denies.

- **Paragraph 6:** Admits that Peymon Mottahedeh is the founder of Freedom Law School but denies remaining allegations. Denies the slanderous label of "tax defier" and denies the belittling label of "so-called." Denies that Freedom Law School "teaches frivolous tax avoidance schemes."

- **Paragraph 7:** Admits marital status but denies remaining allegations.

Page 3

- **Paragraph 8:** Denies.

- **Paragraph 9:** Admits, except that Defendant April Mottahedeh lived in California from June 23, 2001 to December 31, 2001 only, not throughout the 2001 year.

- **Paragraph 10:** Admits, except that Defendants were married on June 24, 2001.

- **Paragraph 11:** Admits to being "heavily involved" in Freedom Law School, which Defendant founded in 1996. Denies that Defendant April Mottahedeh has been heavily involved in Freedom Law School. Denies that Freedom Law School teaches frivolous tax avoidance schemes. Denies the belittling "so-called" label.

- **Paragraph 12:** Admits.

- **Paragraph 13:** Denies that the claim that "no law requires 99% of Americans to file and pay income tax" is false.

- **Paragraph 14:** Denies.

  **Paragraph 15:** Admits to collecting fees from Freedom Law School students. Denies receiving "other income".

- **Paragraph 16:** Denied. This assertion compounds one baseless assumption on top of another baseless assumption.

Page 4

- **Paragraph 17:** Admits, but denies the characterization that Peymon "brags".

- **Paragraph 18:** Admits.

- **Paragraph 19:** Denies.

- **Paragraph 20:** Admits that the Complaint alleges notices of deficiency were issued but denies their validity and legal effect.

- **Paragraph 21:** Admits.

- **Paragraph 22:** Admits that a Tax Court decision and appellate proceedings are alleged but denies that the IRS correctly calculated the Defendants' aggregate income for 2001 through 2006, denies that Defendants' income was properly allocated, denies being liable for penalties, denies any characterization inconsistent with applicable law, and reserves all defenses.

- **Paragraphs 23 through 34:** Denies.

**PART III: AFFIRMATIVE DEFENSES**

Without assuming any burden not otherwise imposed by law, Defendant asserts the following defenses pursuant to Fed. R. Civ. P. 8(c):

- **First Affirmative Defense – Failure to State a Claim:**

  The Complaint fails to state a claim upon which relief can be granted, including a failure to establish valid and enforceable assessments.

- **Second Affirmative Defense – Invalid Assessments:**

  Plaintiff's claims are legally barred because the tax liabilities underlying the Complaint were not "timely and properly" assessed as alleged. To the contrary, the assessments were made in direct violation of mandatory statutory timeframes and express restrictions on assessment. Any assessment made in violation of such statutory timing restrictions is legally defective, void *ab initio*, and cannot support a judgment.

- **Third Affirmative Defense – Unclean Hands and First Amendment Viewpoint Discrimination (Illegal Designations and Tainted Referral):**

  Plaintiff's Complaint is irreparably tainted by its reliance on statutorily prohibited designations, and therefore Plaintiff seeks equitable relief with unclean hands. Under Section 3707(a) of the IRS Restructuring and Reform Act of 1998 (RRA 98), IRS officers and employees are strictly forbidden from labeling taxpayers as "illegal tax protesters (or any similar designation)." Pub. L. 105–206, title III, § 3707(a). Congress enacted this strict prohibition to prevent

unconstitutional viewpoint discrimination against citizens exercising their First Amendment right to hold and express dissenting political and legal views regarding federal tax law.

Crucially, Congress explicitly provided the lawful, neutral alternative. Under Section 3707(b), the agency is expressly permitted to designate an appropriate taxpayer by the factual administrative term "nonfiler." Defendants readily admit they are nonfilers based on their good-faith understanding of the law. Therefore, Plaintiff possessed a congressionally mandated, factually neutral designation for Defendants.

However, Plaintiff is actively circumventing this clear Congressional mandate. As explicitly admitted in the Plaintiff's own Complaint, this action was "authorized and requested" by the Chief Counsel of the IRS pursuant to 26 U.S.C. §§ 7401 and 7403. Consequently, the Department of Justice (DOJ) Civil Division, Tax Litigation Branch, is acting purely as the direct litigation arm of the IRS, prosecuting a case built entirely upon IRS investigatory files and administrative referrals.

Instead of adhering to the statute, Plaintiff purposefully bypassed the authorized "nonfiler" designation. By adopting the highly prejudicial terms "tax defier" and "frivolous tax avoidance"—mere semantic substitutes for the forbidden labels—the DOJ is laundering the IRS's

statutorily prohibited internal bias into the public court record. Plaintiff cannot weaponize in litigation what the underlying agency is expressly prohibited by law from doing administratively. Plaintiff's deliberate substitution of the congressionally mandated neutral term with retaliatory labels constitutes unconstitutional viewpoint discrimination and a flagrant attempt to circumvent a clear Congressional mandate, thereby unfairly prejudicing the Court and barring Plaintiff's claims under the doctrine of unclean hands.

- **Fourth Affirmative Defense – First Amendment Retaliation and Unconstitutional Prior Restraint:**

    This enforcement and injunction action was authorized and initiated not for a legitimate administrative tax purpose, but as a direct, retaliatory measure designed to silence, chill, and punish Defendants' protected speech, associations, and educational activities regarding the administration of federal tax laws.

    Furthermore, the broad equitable injunction sought by Plaintiff operates as an unconstitutional prior restraint on Defendants' future First Amendment rights to speak, publish, educate, and petition the government regarding the constitutional limits of federal tax laws. The

Court should decline to grant equitable relief that serves as a federal tool for First Amendment retaliation and censorship.

- **Fifth Affirmative Defense – Lack of Proper Notice and Demand:**

  Plaintiff has not established that proper statutory notice and demand were made as required by law.

- **Sixth Affirmative Defense – Statute of Limitations:**

  Plaintiff's claims may be barred in whole or in part by the applicable statutes of limitation.

- **Seventh Affirmative Defense – Penalties Not Properly Assessed:** Any claim for penalties, including "accrued but unassessed" penalties, is barred to the extent such penalties were not properly assessed in accordance with statute.

- **Eighth Affirmative Defense – Reservation of Additional Defenses:**

  Defendant reserves the right to assert additional defenses as they become known through discovery.

**PRAYER FOR RELIEF ON THE COMPLAINT**

WHEREFORE, Defendant Peymon Mottahedeh respectfully requests that the Court:

A. Deny all relief requested in Plaintiff's Complaint;

B. Dismiss Plaintiff's Complaint with prejudice;

C. Order the IRS to expunge all "tax defier", "tax protester", or similar designations from Defendants' records; and

D. Grant such other and further relief as the Court deems just and equitable.

## PART IV: COUNTERCLAIMS

Defendant/Counterclaim Plaintiff Peymon Mottahedeh (hereafter "PEYMON"), individually, alleges the following Compulsory Counterclaims against the United States of America and the individual Counterclaim Defendants named herein:

## A. JURISDICTION, VENUE, AND COMPULSORY NATURE

35. Jurisdiction is proper under 28 U.S.C. § 1331, 26 U.S.C. § 7433, 5 U.S.C. § 702 (Administrative Procedure Act), and the First Amendment to the United States Constitution under *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971).

36. Venue is proper in the Middle District of Florida.

37. This Counterclaim is compulsory under Fed. R. Civ. P. 13(a) because it arises out of the exact same transaction, occurrence, and administrative record that forms the basis of the Plaintiff's Complaint.

38.     The Plaintiff has made slanderous labels against DEFENDANTS, such as labeling PEYMON as a "tax defier", claiming he "teaches frivolous tax avoidance schemes" and "promoted various techniques for fraudulently evading the payment of federal income taxes." Because these labels are a necessary element of the Complaint to justify the application of maximum penalties on DEFENDANTS, a judicial determination on these labels will operate as *res judicata.*

39.     Whenever the government puts an issue before the court to decide, since all aspects of that issue must be resolved once and for all, the government has waived sovereign immunity for actions and facts that are related to the facts and issues that the government has raised in the government's complaint. Therefore, sovereign immunity does not bar the counterclaim of DEFENDANTS.

40.     Therefore, DEFENDANTS must bring these claims in this case to vindicate their rights, and the Court must evaluate and rule on these labels and issues in this action, or DEFENDANTS will be forever barred from bringing them in future litigation.

41. This counterclaim is a *Bivens* Action against many IRS employees and top managers, who outside of their authority, chose to label PEYMON and later on APRIL with stigmatizing terms such as "illegal Tax Protester" or "Tax Defier", to prejudice the courts against PEYMON, to arbitrarily and summarily rule against PEYMON, and to otherwise intimidate and harass PEYMON from exercising PEYMON's First Amendment Rights to speak about, publish material, gather and associate with like-minded Americans about the wholesale violation of the American People's rights by the IRS and the use of

intimidation, propaganda, and other illegal means to force the American People to pay federal income taxes that Americans do not owe. The ultimate purpose of PEYMON's actions is the wholesale petitioning of the US Government to put an end to this abuse of power of these IRS leaders whose goal has been to increase their power, prestige, pay grade, and assure a comfortable pension for themselves by guaranteeing that with a big and powerful IRS there will be a job, a good pension, and the above-listed benefits.

## B. FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

*INTRODUCTION TO COUNTERCLAIMANT PEYMON MOTTAHEDEH*

42.     Defendant and counterclaimant Peymon Mottahedeh (hereafter "PEYMON") was born in Tehran, Iran in 1962 into a Jewish family and attended 9 years of education at a Jewish school from 1968 until 1977 before coming to California in the summer of 1977.

43.     From the age of 6 until the age of 14, PEYMON used to sit next to his father Emmanuel Mottahedeh at family and other social gatherings as PEYMON heard his father talk about politics with family, friends, and acquaintances. In these gatherings, PEYMON heard his father talk about freedom or health issues with other individuals.

44.     At these gatherings, PEYMON's father would discuss the politics between America and the Western World versus the Soviet Union, the Arab-Israeli conflict, and Iranian politics. In these gatherings, PEYMON learned about the difference between America and Western Europe, which are supposed to be countries where the

people are free, versus the totalitarian communist Soviet Union, where the people are not free.

45.     In these gatherings, PEYMON heard that the Shah, the King of Iran, was an absolute dictator and ruler that the Iranian People were not allowed to publicly criticize. In these gatherings, PEYMON learned that if an Iranian citizen were openly critical of the Shah of Iran, the Iranian citizen could be kidnapped by the Shah of Iran's secret service, called SAVAK, without notice, tortured in jail, jailed for as long as SAVAK wanted without a judicial determination, kept in jail without a judicial order, and convicted and sentenced without a jury trial by a government-paid and biased judge of the Shah of Iran.

46.     In these gatherings, PEYMON learned that in Iran the newspapers were censored by the Shah of Iran and that if a newspaper were to publish anything that was critical of the Shah of Iran, the newspaper could be closed by SAVAK. In these gatherings, PEYMON learned that in Iranian judicial proceedings against critics of the Shah of Iran, the judges were not free to rule in favor of the citizen and that the judges were required to act in a biased manner in favor of protecting the integrity, interests, and reputation of the Shah of Iran.

47.     In these gatherings, PEYMON learned that in Iran the people were not allowed to publicly demonstrate or express criticism against the Shah of Iran, and that if they did so they could be subject to the same punishments described above by SAVAK.

48.     When PEYMON came to America in 1977, PEYMON was amazed by the level of prosperity and freedom available in the United

States of America compared to Iran. When PEYMON came to America in 1977, PEYMON was delighted to hear again that in America the American People are completely free to express their opinions and criticism of any government agents of any kind as much as they want without any restraint or punishment of any kind for such expressions. Even the President of the United States can be called anything, lie, truth, or even foul language, without any fear of any punishments by government agents for such speech.

49. PEYMON was delighted to see for himself that newspapers, radio, and television stations in America are not censored and were free to express any criticism of any government agent or official of any kind without any fear of censorship, closure, or punishment by the government. PEYMON was delighted to see for himself that Americans also have an absolute right to gather, demonstrate, and express their criticism of any government agent in any peaceful way that they wished.

50. PEYMON was delighted to see for himself and to understand that in America a citizen could in no way, shape, or form be fined, punished, or jailed for expressing his opinions about government corruption, criminality, or violations of the law, or to petition their government to have the government stop or eradicate illegal and unconstitutional behavior by government agents.

51. In 1975, PEYMON had read a book by Kermit Roosevelt Jr., the grandson of US President Theodore Roosevelt, who explained how he, as a CIA agent, had organized and orchestrated a successful coup d'état against the democratically elected Prime Minister of Iran

Page 14

named Mohammad Mossadegh to be replaced by the Shah of Iran as a dictator king. This was because Mossadegh wanted a larger share of the oil revenue of Iran that the British oil company had obtained since 1901 from the previous Shah of Iran, and the British oil companies had refused to do so, which led to Mossadegh nationalizing Iranian oil companies.

52.     PEYMON was very happy to have had the opportunity to come to America in 1977 and proudly chose to make America, the land of the free and the home of the brave, his new home. PEYMON graduated from high school in Tustin, California in 1980 and thereafter attended college and university in California. PEYMON attended the University of California at Long Beach from 1982 forward and obtained a Bachelor of Science in Business Administration in Marketing.

53.     PEYMON, in his economics classes in college and university, discovered that economically America is not the completely free society as it was originally at the time of the Founding Fathers and during the 1800s, as seen by PEYMON in Western movies and television series that were shown in Iran in the 1960s and 1970s. PEYMON in his economics classes discovered that America is no longer a completely free enterprise society but is a semi-socialist country with many socialist programs like Social Security, Medicare, food stamps, socialist health care for many citizens, and other socialist government assistance programs, along with a progressive federal income tax, which is one of the 10 planks (goals) of The Communist Manifesto as published by Karl Marx.

54.    PEYMON in his economics classes discovered that since the end of World War II, the US government has on different occasions invaded other countries and/or set up coups d'état against governments of many countries that the United States government did not like, as opposed to America's early history where America minded its own business instead of invading other countries.

55.    PEYMON in his economics classes discovered that people who believe in PEYMON's philosophy of "live and let live, love and let love, keep your agreements, and do not violate others' rights," such as US President Thomas Jefferson, used to be called "liberal," but today they are called "libertarian." Therefore PEYMON started telling people that PEYMON is a libertarian.

56.    Realizing that Americans have lost much of their liberties over the last 200 years since the American Revolution, one of the first things that PEYMON did when PEYMON became an American citizen in 1989 was to register as a Libertarian Party member, join the Libertarian Party, and start attending the meetings of the Orange County, California Libertarian Party so that PEYMON could do his part in restoring the freedom in America for Americans as envisioned by America's Founding Fathers.

57.    PEYMON had completed 2 business law classes during his college/university years, but was taught nothing about the Declaration of Independence, the US Constitution, or the Bill of Rights. From 1989 until 1993, PEYMON became continually more active in the Orange County Libertarian Party, publicizing the Libertarian Party's goals and principles, holding display tables at

various locations for the Libertarian Party, organizing meetings for the Libertarian Party, and speaking at other groups' meetings about the Libertarian Party.

58.     During the 1980s and early 1990s, PEYMON never had a stable, one-income good-paying job. PEYMON held many part-time minimum or sub-minimum wage jobs and/or commissioned jobs such as selling home loan mortgages, selling life insurance, setting up mutual funds and mutual fund IRAs for individuals, sparingly interpreting Persian during court proceedings, depositions, or doctor's visits for non-English speaking Iranian people, operating a mailbox rental store, selling medical X-ray film to doctors and chiropractors, and other very low-paying part-time jobs.

59.     PEYMON filed only two tax returns in the late 1980s, which were based on the request of his ex-wife Vivian Mottahedeh (hereafter, "VIVIAN") for PEYMON to sign on VIVIAN's tax return so that VIVIAN, who had a decent, higher-paying job at the University of California in Long Beach, could get a larger refund on VIVIAN'S tax return. In 1989, the IRS levied VIVIAN's paycheck, which showed PEYMON how the IRS can be oppressive and hurt Americans. PEYMON and VIVIAN separated in 1989 and divorced in 1990.

60.     In 1990, a local IRS agent in Long Beach, California audited the 1988 tax return of PEYMON and VIVIAN, in particular questioning the mileage expenses of PEYMON for his travels to potential clients' visits for selling life insurance to them. PEYMON and VIVIAN attended the audit with the IRS agent in Long Beach, California and

provided documentation of the business mileage expense records that the IRS agent was auditing.

61. The IRS agent did not question the mileage expense records of PEYMON and accepted them in full. The IRS agent took a few minutes to do some calculations and then told VIVIAN and PEYMON that based on a recalculation of VIVIAN and PEYMON's taxes, VIVIAN and PEYMON owed the IRS about $220.

62. PEYMON asked the IRS agent to leave the audit room with VIVIAN so that VIVIAN and PEYMON could discuss their options outside of the IRS Building. PEYMON told VIVIAN that since the IRS agent did not question the authenticity or correctness of PEYMON's business mileage expense records, the result of the audit should be that PEYMON and VIVIAN owe the IRS nothing.

63. PEYMON told VIVIAN that neither PEYMON nor VIVIAN had any knowledge on how to properly and legally challenge this baseless and fraudulent claim/extortion by the IRS agent that PEYMON and VIVIAN owe the IRS any money, and that to hire and pay a professional to challenge the IRS's baseless and fraudulent claim that VIVIAN and PEYMON owed the IRS about $220 would cost them more than the $220. Financially, the best course of action for VIVIAN and PEYMON would be for each to pay half of the extortion amount demanded by the IRS agent and end the IRS harassment, and that is what VIVIAN and PEYMON did after this meeting by going inside and paying the IRS agent in person.

64. This experience taught PEYMON that the IRS is an out-of-control, powerful agency, which apparently abuses its powers and the

Page 18

American people's lack of knowledge and funds to defend themselves against the IRS, to deceive and extort money from Americans; money that the American People legally do not owe the IRS.

65.     In the morning of a day in early April of 1992, PEYMON heard a woman named Tina on KFI AM radio station, one of the largest AM radio stations in Los Angeles, California, who claimed that the federal income tax is voluntary. PEYMON found Tina's claim to be unbelievable, but novel and interesting. PEYMON wondered to himself why Americans would want PEYMON to set up an IRA for them to lower their federal income taxes, when Tina claimed that there's no law requiring the American People to file and pay income tax to begin with.

66.     Due to PEYMON having been taught by PEYMON's father to always have an attitude of continuous learning, PEYMON being a libertarian against communism and Marxism, and PEYMON having a history of being very good at mathematics and logical thinking, PEYMON decided to call Tina and find out why Tina says that the average American does not legally have to file and pay federal income taxes.

67.     PEYMON called Tina the same evening and asked Tina why she claims that the federal income tax is voluntary. Tina told PEYMON that for PEYMON to completely see and understand why no law requires Americans to file and pay federal income tax, PEYMON needed to come to Tina's seminar later that week for Tina to show it to PEYMON in detail at a cost of $40.

68.     PEYMON objected to the $40 price tag, stating that if Tina is right, Tina has the right to charge PEYMON for whatever service Tina offers PEYMON to be federal income tax-free for the rest of PEYMON's life. Tina insisted on getting paid the $40 and told PEYMON that if PEYMON is not convinced that legally the average American does not have to file and pay federal income tax, Tina would refund PEYMON's $40. Due to this refund policy, PEYMON agreed to attend Tina's seminar and did so.

69.     At Tina's seminar, PEYMON was amazed that no section of the Internal Revenue Code that the IRS cited in the 1040 Income Tax return instruction manual made an American liable for the federal income tax. At Tina's seminar, PEYMON saw and read Title 26 Section 6011 that was listed in the 1040 Income Tax Return instruction booklet as one of its authorities, which states "... any person made liable for any tax imposed by this title, ... shall make a return or statement..." This does not require any American to file and pay federal income tax but only refers to persons who *already* are made liable for the tax to file a tax return.

70.     At Tina's seminar, PEYMON saw and read Title 26 Section 6001 that was listed in the 1040 Income Tax Return instruction booklet as one of its authorities, which states "Every person liable for any tax imposed by this title,... shall keep such records,... make such returns,..." This already assumes that the person is liable for the income tax, and it does not impose a tax by itself.

71. At Tina's seminar, PEYMON was amazed to learn that the 5th Amendment of the U.S. Constitution protects the American people

from being forced to give any information to the US government and its agencies that may potentially lead to that person's criminal prosecution by the US government. PEYMON was very excited about this information and did not seek to get the $40 back from Tina.

72.     PEYMON decided to do his homework and independently verify some of the most important claims made by Tina. PEYMON at his home pulled out the 1040 instruction manual that he had saved from the last time that PEYMON and VIVIAN had filed a 1040 tax form with the IRS, and looked up the warning on this IRS instruction manual that warned Americans that any information that they give to the IRS on the 1040 form may be shared with state or local governmental entities or foreign countries.

73.     PEYMON decided to find and read the 5th Amendment by himself. PEYMON asked his roommate, who was a public-school teacher, if he had a copy of the US Constitution so that PEYMON could find and read the 5th Amendment for himself. PEYMON's roommate told PEYMON that the back of the US history book that he teaches at school contains a copy of the US Constitution that PEYMON can read for himself. PEYMON looked up the 5th Amendment of the US Constitution in the US history book of his roommate and verified that the language of the 5th Amendment in his roommate's US history book is the same as the one that was shown to PEYMON in Tina's presentation.

74.     PEYMON thought about the issue of the 5th Amendment and realized that PEYMON would be giving any information to the IRS on the 1040 form voluntarily, and that is why the IRS could potentially

share that information with the government of Iran, which could potentially be used against PEYMON to put PEYMON in prison. PEYMON realized that this statement in the IRS's 1040 instruction manual is basically a Fifth Amendment warning to the American people that they are voluntarily giving information to the IRS that could be potentially shared with domestic and foreign governments that they and the IRS may use criminally against PEYMON and the American people.

75.      At this point, PEYMON became convinced that the American people by law are not required to file and pay federal income taxes and decided that PEYMON's mission in life was to educate the American people about the US Constitution and the American system of laws, and how to properly and legally assert and defend their rights, so that they stop giving their hard-earned money to the IRS when there is no law requiring them to do so. That American People's money could be used to better the lives of the American People and their families and to have more available in the pockets of the American People to be able to contribute to libertarian and freedom-minded political candidates, who take their oath to uphold and defend the American People's rights and freedom by upholding and defending the US Constitution from all enemies, foreign and domestic. This is instead of whoring themselves to powerful moneyed special interests and lobbyists who practically buy up politicians, because to win political office political candidates need money to publicize themselves as good people, while demonizing their opponents. In this way, America can return to its roots of freedom

and prosperity for all Americans as envisioned by America's Founding Fathers.

76. Soon thereafter, PEYMON met with his two libertarian friends, Richard Boddie, who has a juris doctor, and Dagny Sharon, a California attorney, to ask their opinion about the correctness or error of PEYMON's findings about the U.S. Constitution and the federal income tax, and whether they recommended that PEYMON go to law school to become a lawyer.

77. To PEYMON's surprise, both Richard Boddie and Dagny Sharon responded that: "You know more about the income tax and the US Constitution than we do. In law school they do not have us read the US Constitution. They have us read US Supreme Court cases about certain parts of the US Constitution and have us argue about their meaning in our law classes."

78. PEYMON was shocked to hear how useless American law schools are in teaching future lawyers about the US Constitution and the federal income tax. Since his father's financial condition had deteriorated after the Iranian Revolution of 1979, PEYMON did not want to impose a financial burden on his father, and as a libertarian PEYMON did not believe in anyone begging from the government for financial help. Due to the fact that apparently PEYMON was learning more from patriotic American citizens like Tina about the US Constitution and the federal income tax, PEYMON chose not to waste 5 to 6 years of his life pursuing a law degree, while at the same time he would have to work full time to feed, house, and clothe himself and a family that PEYMON might have during those years.

Page 23

79. Tina introduced PEYMON to other individuals that were interested in studying and understanding the US Constitution and laws, and how to protect and defend their rights and not to pay federal income taxes that they legally did not owe. PEYMON found that these people call themselves patriots or freedom seekers.

80. PEYMON was surprised to find that in America, the land of the free, the home of the brave, there is a freedom movement afoot that, unlike Iran, is not underground and illegal, but nonetheless does exist, and the mainstream media deliberately ignores its existence and its legal points and concerns. PEYMON was happy to find out that there are freedom and patriot-minded Americans who are willing to educate themselves, each other, and PEYMON, and take a stand to restore freedom in America for all Americans as envisioned by America's Founding Fathers, which had been eroded over the previous 200 years.

81. All of the above further convinced PEYMON that he needs to do his part to educate himself further about the US Constitution, the American system of laws, and the proper legal procedures to assert and defend his rights not to pay federal income taxes that PEYMON does not owe, and at the same time educate other fellow Americans who are interested in doing the same.

82. In 1994, after about 2 years in the "Freedom Movement" or "Patriot Movement," as these people collectively called themselves, PEYMON started teaching some very basic classes on the US Constitution, the federal income tax, and legal procedures in the living room of his apartment on Myford Road in Tustin, California.

83.     PEYMON kept improving these once-a-week, nighttime, 3-hour classes and over time took out and corrected any errors and mistakes in his teachings as soon as he discovered them. PEYMON was fortunate to meet a man named Bill MacArthy who taught PEYMON how to look up and find any law book and the relevant part of the law in the Santa Ana Law Library in Santa Ana, California, which was only about 12 minutes away from PEYMON's apartment.

84.     The knowledge of how to find and read any law enabled PEYMON to rapidly expand his knowledge of law and legal procedures, knowledge that PEYMON readily added to his classes. By late 1995, PEYMON was getting compliments from several people that PEYMON's classes were the most informative and educational classes about the US Constitution, the income tax, the law, and legal procedures compared to classes offered by other patriotic legal education teachers.

85.     The above led PEYMON to officially create Freedom Law School on January 1, 1996. The first class that was taught at Freedom Law School in 1996 was called: "A practical road to freedom from oppressive taxation and control, a course in law and procedures for those who are committed to living a free life."

86.     From 1996 to the middle of 1998, PEYMON developed over 10 other classes on the US Constitution, law, and legal procedures that PEYMON had developed by himself or put together with the assistance and/or participation of other knowledgeable legal researchers and writers. PEYMON combined and still combines education about the US Constitution, the law, cartoons about the IRS,

Page 25

humor, and parody to educate, expose, and eliminate federal income tax slavery for Americans who legally did not and do not owe federal income tax to the IRS.

*COUNTERCLAIM DEFENDANTS AND THEIR MANNER OF VIOLATING FIRST AMENDMENT RIGHTS OF PEYMON AND APRIL*

87.     Since 1994, certain IRS employees at the direction of their managers, going all the way up to the top leadership of the IRS, have engaged and continue to engage in a pattern of animosity, harassment, and retaliation against PEYMON. The explicit goal of these top leaders of the IRS and the lower-level IRS employees has been to silence PEYMON from exercising his First Amendment rights to free speech, assembly, association, and peaceably petitioning the government for a redress of grievances regarding the improper administration of federal tax laws by certain top leaders/managers of the IRS.

88.     These IRS employees see their jobs, their career advancements at the IRS, and pensions at risk of being reduced or eliminated if PEYMON's First Amendment activities were to ever get large enough to make a large number of the American People and Congressmen aware of the misadministration of the Internal Revenue Laws by IRS top leaders on the American People who do not owe federal income tax, to be able to put a stop to the misapplication of federal income tax laws.

89.     The name of any party named by this counterclaim may be that party's pseudonym. If and when DEFENDANTS discover the true name of such parties, DEFENDANTS reserve the right to amend this

lawsuit to substitute the pseudonym of said party with the real name of said party in the Counterclaim. This documentation referred to below will establish that PEYMON was explicitly targeted by these top leaders and regular employees of the IRS for exercising his rights to speech, publication, and association for the purpose of creating a large First Amendment Petition groundswell to put a stop to the IRS Top Leaders' misapplication of the federal income tax.

90.    This animus of these IRS employees against PEYMON is explicitly documented in the IRS's own files. In early 1994, counter-defendant IRS employee Paul Von Ravensberg (hereafter, "PAUL") recorded a note regarding PEYMON, stating: "RECD [received] case from MGR [manager], developed & referred potential fraudulent TX [tax] protester promoter info to CID [Criminal Investigation Division]." Under the "person contacted" column, PAUL listed "Sue Gary (CID) (714)643-4064 x 94."

91.PAUL and/or another IRS employee attended one or more meetings of Richard MacDonald in 1993 or 1994 who held monthly legal and political meetings at the Beverly Garland Holiday Inn Hotel in North Hollywood, California, where PEYMON had First Amendment material to share for free or for purchase for the American People who attended. At these meetings, PEYMON displayed several cartoons that mocked and criticized the IRS and IRS psychology over the American People, such as cartoons depicting that the American People have become slaves to the IRS and pay tribute to the IRS as a religious ritual because the IRS, TV, news broadcasters, and charismatic religious preachers have brainwashed the American

Page 27

People to pay income taxes that they do not owe, through mental and emotional manipulation such as fear, stress, adoration of government, fatigue, anxiety, relaxation, shock, panic, and continuous messaging to Americans to "pay your taxes" and "file early."

92.     At the time these notes were made by PAUL, no evidence existed to suspect that PEYMON was a potential fraudulent tax protest promoter. The cartoons of PEYMON described above and other First Amendment Protected printed material of PEYMON, which criticized and ridiculed the IRS and the Major Media's ability to brainwash the American People into federal income tax slavery, were the ONLY reasons that PAUL and other IRS employees decided to suspect that PEYMON was a "potential fraudulent tax protest promoter."

93.     For about 18 months PAUL had regular meetings with other counter-defendants, such as Sue Gary, Dee Rodriguez, and Jose Martinez, to discuss PEYMON as a potential fraudulent tax protest promoter, and on December 13, 1994, PAUL submitted a Fraud Referral form to PAUL's manager.

94.     On September 21, 1995, counter-defendant Jose Martinez told PAUL that the Criminal Investigation Division of the IRS would stop investigating PEYMON and PEYMON would now be harassed by PAUL by misusing the audit process to chill PEYMON'S exercise of his First Amendment rights.

95.     At the direction of the IRS's top leadership, these First Amendment protected materials and more were collected and

Page 28

retained by PAUL and/or other IRS employees to potentially be used against PEYMON for PEYMON's exercise of his First Amendment Rights. These counter-defendants and other to-be-named counter-defendants labeled PEYMON as an "Illegal Tax Protester" or similar derogatory and stigmatizing designation.

96.    These top leaders and employees of the IRS, as all Federal Government employees, have all taken an oath as provided in 5 U.S. Code § 3331 to uphold and defend the US Constitution from all enemies, foreign and domestic. It is not a part of the job description and/or duties of these top leaders and employees of the IRS to misuse their powers to attempt to stop or chill the exercise of First Amendment Rights of DEFENDANTS.

97.    In 1998, Congress explicitly recognized the severe prejudice caused by these labels and forbade the IRS from using them. Under Section 3707 of the IRS Restructuring and Reform Act of 1998 (RRA 98), IRS officers and employees are strictly forbidden from labeling taxpayers as "illegal tax protesters (or any similar designation)." Pub. L. 105–206, title III, § 3707, July 22, 1998, 112 Stat. 778.

98.    Despite this Congressional ban, IRS managers and employees have continually to the present day maintained these defamatory labels in PEYMON's files, subjecting him to parallel criminal and civil administrative proceedings in an attempt to assess unlawful taxes, close his organization with injunctions, and secure his imprisonment to silence his viewpoints.

99.    Some, but not all, of these derogatory and stigmatizing labels used by counter-defendants since 1994 until today are: "Tax defier",

Page 29

"promoter of various techniques for fraudulently evading the payment of federal income taxes", "tax evader", "tax evasion advocate", "tax evasion promoter", "frivolous tax promoter", "frivolous fraudulent tax evasion promoter", "promoter of frivolous tax evasion schemes", "teaches frivolous tax avoidance schemes", "teaches frivolous tax evasion schemes", and other labels that combine the terms: 1) frivolous, 2) evasion, 3) fraud, 4) fraudulently in combination with these other words as 1) teaches, 2) advocates, 3) promotes, 4) tax.

100.    All of these and similar labels are a form of calling PEYMON an "illegal tax protester," which Congress banned the IRS from using against any American in 1998 by law.

101.    In 2006, Counterclaim Defendant Kirk Parbonini (hereafter, "KIRK") attempted to violate the privacy and associational rights of PEYMON by initiating meritless investigations and issuing overbroad, illegal summonses to several Orange County, California hotels to obtain the names of attendees at PEYMON's educational rallies, all in violation of the First Amendment rights of PEYMON and attendees of First Amendment protected events of PEYMON, which featured many speakers, such as authors, Congressmen, and Governmental whistle-blowers to openly talk, discuss, and share their findings about abuse of power, violations of law, and improprieties by American politicians and bureaucrats, including the IRS.

102.    Defendant KIRK knew and should have known that it is not a part of KIRK's job as a Special Agent to violate and attempt to chill the free exercise of First Amendment Rights of PEYMON and the

Page 30

people who attended the events that PEYMON had organized for public attendance and participation. KIRK took the actions above because PEYMON was labeled in the IRS's files with a term equivalent to the term "tax protester" as described above.

103.    DEFENDANTS sued to quash the IRS summons of the only one of the 3 hotel IRS summonses where PEYMON held annual public meetings, because the hotel had notified PEYMON of the existence of the summons of their Hotel: the summons of the Atrium Hotel. DEFENDANTS also sued KIRK in his personal capacity for attempting to infringe and chill the First Amendment activities of DEFENDANTS and attendees of Freedom Law School seminars. Very shortly thereafter, KIRK rescinded his summons of the Atrium Hotel, and the Court dismissed the Petition to Quash the Summons and the related First Amendment claims of DEFENDANTS as moot.

104.    In 2009, due to IRS employees having previously labeled PEYMON as an illegal tax protester or a similar designation, Counterclaim Defendant John Black (hereafter, "JOHN") created an arbitrary assessment of over $663,000 in payroll taxes based solely on the visual observation of five cars parked in front of DEFENDANT's home, in one day, in less than 1 hour at 9582 Buttemere Road, Phelan, California 92371, by arbitrarily assuming the cars not to be owned by any of PEYMON's "known relatives" and then assuming them to be full-time employees for a period of 13 years backwards from 2009 to 1996.

Page 31

105. JOHN filed pages and pages of FICA and other payroll tax liens, based on JOHN'S above-described baseless assumptions of fact, in the County Recorder of San Bernardino County, California.

106. JOHN and Counter-Defendant JOHN'S MANAGER met with PEYMON at an IRS office to hear PEYMON about the reasons why these tax liens should be removed. JOHN and JOHN'S MANAGER at the meeting kept insisting that PEYMON was required to file numerous tax returns for each of the alleged quarterly taxes for various alleged payroll taxes, and declare under penalty of perjury what the actual tax for each of the taxes for each of the 13 years' tax quarters (52 quarters of a year) was.

107. PEYMON asked JOHN and JOHN'S MANAGER about the factual basis of these alleged taxes at this meeting. JOHN and JOHN'S MANAGER repeatedly refused to tell PEYMON the factual basis of these alleged payroll taxes because JOHN and JOHN'S MANAGER knew that they had used a completely baseless assumption that 5 cars parked outside of PEYMON'S home for 1 hour, in one day, that allegedly were not owned by any of PEYMON'S "known relatives," was a completely bogus and illegal attempt to try to get PEYMON to sign over 52 quarterly federal payroll tax returns going back 13 years, and they did not wish to expose their illegal, fraudulent acts to PEYMON.

108. JOHN and JOHN'S MANAGER did the above acts and brazenly defied tax laws because JOHN, JOHN'S MANAGER, and previous IRS employees had labeled PEYMON as an illegal tax protester or a similar label, as a continued attempt by the top leaders of the IRS to

Page 32

discourage or stop PEYMON from exercising PEYMON's First Amendment exposures of IRS top leaders who have been defying tax laws, violating American People's rights, and extorting through deception and intimidation great sums from the American People who did not and do not owe such taxes to the IRS.

109.   PEYMON submitted a Freedom of Information Act Request to the IRS to obtain the notes of JOHN about the factual reasons behind the creation of these tax liens against PEYMON. PEYMON asked for and received the documentation. PEYMON received a Notice of Tax Lien Filing and Notice of your right to a hearing from the IRS about the above-mentioned taxes. PEYMON asked for and received a collection due process hearing with an IRS Appeal officer.

110.   The Collection Due Process hearing officer and counter-defendant Teresa Peck (hereafter, "TERESA") noticed in PEYMON's IRS files that PEYMON had been labeled by the IRS as an illegal tax protester or similar designation. Based on the illegal tax protester designation or similar designation, TERESA conducted only one collection due process hearing call with PEYMON and told PEYMON that PEYMON cannot legally challenge these tax liens, even though PEYMON informed TERESA that PEYMON never received a Notice of Deficiency, nor had a prior opportunity to challenge these taxes as provided in 26 U.S. Code § 6320 and § 6330(c)(2)(B).

111.   TERESA deliberately chose to defy 26 U.S. Code § 6320 and § 6330(c)(2)(B) and not allow PEYMON to challenge the underlying tax liability of these tax liens and told PEYMON "I am here only to make payment arrangements" and issued an adverse determination against

PEYMON because of PEYMON's labeling by previous IRS employees and/or TERESA choosing to brazenly defy the tax laws.

112.     PEYMON appealed TERESA's adverse determination against PEYMON to the US Tax Court. In the US Tax Court, the IRS lawyer Sebastian Voth, in reviewing the files, noticed that PEYMON was denied the opportunity to challenge the tax liens and honorably remanded the case back to IRS Appeals to give PEYMON a new Collection Due Process hearing that will allow PEYMON to challenge the underlying tax liability that these tax liens were based on.

113.     On remand, PEYMON explained everything to the new IRS Appeal Officer W. Robson orally and in writing, and W. Robson honorably in a supplemental Notice of Determination on November 28, 2011, ruled that JOHN's tax liens were baseless and illegal and should be removed. The IRS officially removed these tax liens on December 12, 2011, by filing multiple "Withdrawal of Filed Notice of Federal Tax Lien" notices in the San Bernardino, California County Recorder's office. The US Tax Court on November 13, 2012, officially ratified IRS Appeal officer W. Robson's ruling in favor of PEYMON.

114.     In years 2000 through 2008, the IRS with DOJ's representation filed dozens and dozens of actions in US District Courts as abusive tax shelter promotions and closed these organizations or individuals from promoting alleged tax shelter promotions, fined them for each tax shelter that they had allegedly sold, ordered them to stop operating, and ordered them to post the Court order on their websites. Sometime between 1999 and 2003, IRS leadership

Page 34

instructed lower-level IRS employees to start investigating PEYMON as an "abusive tax shelter promoter."

115.    On April 16, 2003, Counterclaim Defendant Frank P. Nixon (hereafter, "FRANK"), who was the IRS's Area Director of the Small Business/Self Employed Compliance Area 14 in Laguna Niguel, California, wrote a hand-signed letter to PEYMON, illegally assuming that PEYMON conducts and has "tax shelter promotion(s), including, but not limited to, Freedom Law School and related promotions" and that the IRS is "considering possible action [against PEYMON] under Sections 6700, 6701, 7402, 7407 and 7408 of the Internal Revenue Code. These sections relate to penalties and injunctions for aiding and abetting in the understatement of tax liabilities, and/or for promoting abusive tax shelters."

116.    FRANK referred PEYMON's case to an IRS employee named Marynell Steburg (hereafter, "MARYNELL"). MARYNELL wrote a letter to PEYMON on May 14, 2003, to appear at MARYNELL'S OFFICE in Santa Ana, California. MARYNELL issued and hand-delivered an IRS summons to PEYMON on May 19, 2003, to appear and give private information and documents to the IRS on June 2, 2003.

117.    On May 29, 2003, PEYMON wrote a letter to MARYNELL in response to MARYNELL's letter and IRS summons. On June 25, 2003, MARYNELL backed off from their erroneous labeling of PEYMON as an abusive tax shelter promoter. IRS top leaders' attempts to investigate PEYMON to find an excuse under the law to be able to file an injunction order against PEYMON as an abusive tax

Page 35

shelter promoter continued for over 13 more years and ended on July 11, 2016, when an IRS employee wrote a letter to PEYMON stating that the IRS is "discontinuing" the IRS's investigation into whether PEYMON is an abusive tax shelter promoter and has not started such an investigation against PEYMON again.

118.    The instant case is another brazen attempt by the IRS's top leaders to silence and discredit PEYMON's First Amendment efforts to expose and eradicate the IRS Top Managers' continual defiance of the US Constitution and federal tax laws. The IRS's top leadership should know that the IRS has no valid tax assessments against DEFENDANTS, but defiance of the law and violating the law by the IRS's top management is routine for the IRS's Top Leadership.

119.    After Counter-Defendant KIRK rescinded his summons of the Atrium Hotel, the criminal investigation of PEYMON ENDED and very soon thereafter in 2007 or 2008 another civil tax investigation of PEYMON was started. Christiane Thai (CHRISTIANE) was the IRS auditor assigned to this new civil investigation. At a couple of meetings in 2008, CHRISTIANE met with 7 other IRS employees to conspire to stop or silence PEYMON's First Amendment expressions about IRS Top Leaders' defiance of the law.

120.    In this meeting, the attendees were CHRISTIANE, CHRISTIANE's manager, JOHN and his manager, the Abusive Tax Shelter investigator and his/her managers, and 2 IRS lawyers. The attorneys in this meeting were not acting as attorneys in this meeting because there was no litigation in progress. At one of these 2008 meetings, one of the attorneys specifically instructed CHRISTIANE

NOT to ask DEFENDANTS to file tax returns. The reason for the attorney's direction to CHRISTIANE was because the lawyer's real goal was not to get a filed tax return from DEFENDANTS, but to direct an action to curtail and chill the exercise of First Amendment Rights of PEYMON, while the IRS top leaders continue their defiance of the US Constitution and federal tax laws.

121.    The 2 attorneys in this case were illegally using the attorney-client privilege in their unconstitutional and illegal attempts in their personal capacities to stop or silence PEYMON's First Amendment expressions about IRS Top Leaders' defiance of the law. All of these 8 individuals at this meeting in 2008 are Counter Defendants in their personal capacities.

122.    CHRISTIANE in 2008 summoned APRIL's Credit Union records. After another Court Battle to quash this Summons of APRIL's Credit Union Records, the Court allowed the IRS to have APRIL's Credit Union Records. However, CHRISTIANE eventually decided to not use APRIL's Credit Union Records to reconstruct alleged taxable income and liabilities against DEFENDANTS and instead used Bureau of Labor Statistics with very minor modifications to construct alleged taxable income against DEFENDANTS for years 2001 through 2006.

123.    CHRISTIANE and CHRISTIANE's manager, Counterclaim Defendant John Consoli (hereafter, "CONSOLI"), based on Bureau of Labor Statistics, sent 2 audit letters to each DEFENDANT; one on April 25, 2011, and the other on May 10, 2011. DEFENDANTS on May 9, 2011, and June 7, 2011, wrote back to CHRISTIANE and CONSOLI

Page 37

and called CHRISTIANE and CONSOLI and even faxed CHRISTIANE and CONSOLI on June 7, 2011.

124. All of these communications were for the purpose of meeting with CHRISTIANE and CONSOLI as suggested and provided for in the 2 IRS letters. However, CHRISTIANE and CONSOLI consistently refused to agree to meet with DEFENDANTS to disclose or discuss the factual basis of this case and instead quickly issued a Notice of Deficiency against DEFENDANTS for years 2001 through 2006 based on Bureau of Labor Statistics with minor modifications. This forced DEFENDANTS to petition the Tax Court within 90 days, without knowing how the alleged taxable income numbers on the Notices of Deficiency were calculated and based on what set of facts.

125. The reason for the refusal of CHRISTIANE and CONSOLI to meet with DEFENDANTS was because DEFENDANTS were labeled as illegal tax protesters or similar designations by previous and other employees, at the direction of the IRS's top leaders to chill or curtail PEYMON's First Amendment exposure of IRS Top leaders' defiance of the US Constitution and federal tax laws. When CHRISTIANE was asked on the stand during Tax Court as to why CHRISTIANE refused to meet with DEFENDANTS, CHRISTIANE admitted that it was because CONSOLI ordered CHRISTIANE to do so.

126. CHRISTIANE and CONSOLI and the rest of the 8 people at the 2008 meeting are being sued in their individual capacities, since attempts to chill or curtail First Amendment activity is not a part of an IRS employee's job.

127.    DEFENDANTS have not filed or paid any federal income taxes for over 30 years openly and publicly. IRS top leaders know that DEFENDANTS are knowledgeable about tax laws and know that as American citizens of one of the 50 united states DEFENDANTS are not required to file and pay federal income tax and can explain their actions to a federal jury with ease and get an acquittal. This would create very negative and widespread publicity for the IRS top leaders' agenda, who, in their pursuit to protect their jobs, pay raises, and pensions, have been determined to chill or stop PEYMON's First Amendment exposure of IRS top leaders' widespread unconstitutional and federal tax defiance actions.

128.    For this reason, the IRS's top leaders have never tried to indict DEFENDANTS for willful failure to file charges. In October 2024, the IRS's Criminal Investigation Division, at the behest of the top leaders of the IRS, obtained and executed a search warrant at Freedom Law School and the home of DEFENDANTS. Since IRS top leaders know that they cannot get a criminal conviction on DEFENDANTS' failure to file tax return charges, IRS managers are searching Freedom Law School's records and subpoenaing witnesses in an obvious fishing expedition to hopefully find evidence of another tax crime, such as tax evasion, conspiracy to defraud the IRS, lying to the IRS, or mail fraud.

129.    Again, the real purpose of this criminal investigation is to silence PEYMON and stop or curtail PEYMON's exercise of his First Amendment Rights. The instant case is not filed because the IRS is interested in collecting any taxes from DEFENDANTS. The real

purpose of the instant case is the belief and desire of IRS top leaders to extend the 10-year statute of collection for the years 2001 through 2006 to aid the IRS in pursuing tax evasion charges and conviction against PEYMON and thereby discredit and silence PEYMON's continued exposure of IRS top leaders' wholesale defiance and violation of the US Constitution and federal tax laws.

130.    It is not a common practice of the IRS to go after any person by dual civil investigation or dual civil and criminal investigations, as the IRS's top leaders have done with PEYMON repeatedly. The IRS has spent millions of dollars, perhaps tens of millions of dollars over the last 32 years to silence PEYMON's exercise of PEYMON'S First Amendment Rights, which is unheard of. For over 32 years DEFENDANTS have openly not filed or paid any federal income taxes, and never having been to federal prison for openly not filing or paying federal income taxes is also unheard of. This has been done because IRS top managers are very scared of losing their cushy top-level government jobs, benefits, and fat pensions.

131.    This Counterclaim makes it clear that for over 32 years, IRS top leaders and certain associated leaders, in pursuit of being able to continue to get pay raises annually, not lose their fat and comfortable government pensions, and not have their jobs eliminated, have been working continuously and tirelessly to stop PEYMON'S exercise of First Amendment rights in exposing IRS's top leaders.

132.    PEYMON believes and has been teaching Americans that 99% of Americans are not required by laws as published by Congress, interpreted by the Code of Federal Regulations, and upheld by the US

Supreme Court, all in harmony with the US Constitution, to file and pay income taxes. DEFENDANTS have written petitions to each of their 3 Congressmembers, asking their Congressmembers to either correct their legal understanding of the federal tax laws or agree that the law does not make them liable for income, payroll, and self-employment taxes.

133.    PEYMON, for free and on a paid basis, has assisted and guided tens of thousands of Americans to send the same petitions with questions about the applicability of the federal tax, self-employment, and payroll laws to the people of the 50 United States for over 5 years. In these petitions, DEFENDANTS and numerous Americans have told their lawmakers that they are not required to file and pay federal income, self-employment, and payroll taxes, and that if they are wrong they asked their Congressmen to conduct an independent investigation of the legal citations in these petitions and clearly and specifically show that these petitions are legally in error.

134.    In the alternative, if the lawmakers cannot show that DEFENDANTS and the People of the 50 United States are required to file and pay these taxes, the petitions ask the Congressmen to exercise Congressional oversight and stop the IRS top leaders and DOJ managers from misapplying these taxes to the People of the 50 United States. To date, no Congressman has ever been able to refute the legal correctness of these petitions.

135.    IRS top leaders are very aware that the legal and political campaign of PEYMON exposing the IRS top leaders' wholesale defiance of the federal tax laws and the imposing and collecting of

Page 41

income and payroll taxes from the people of the 50 united states has been catching steam, and more and more Americans are asking these questions from their lawmakers through these petitions of PEYMON.

136.    IRS management is the original DEEP STATE long before the FBI and DOJ tried to prosecute Donald Trump and many January 6 people who were set up by the FBI to enter the US Capitol to be charged for serious crimes for simply walking peacefully through the halls of the US Capitol. IRS top leaders have no regard, respect, or allegiance to their oath to uphold and defend the US Constitution from all enemies, foreign and domestic. IRS top leaders are only interested in keeping their high-level, prestigious IRS jobs, pay, power, and comfortable fat pensions in the coming years.

137.    IRS top leaders have been doing all of the above-described defiance of the US Constitution and tax laws in their individual capacities, since violating the US Constitution, federal tax laws, the American People's Rights, and DEFENDANTS' rights are not a part of their official duties and jobs.

## COUNT I: First Amendment Retaliation (Bivens Action) (Against Individual Counterclaim Defendants Black, Parbonini, Von Ravensberg, and others)

138.    DEFENDANTS incorporate all previous paragraphs by reference.

139.    The individual Counterclaim Defendants are sued in their individual capacities, as violating the U.S. Constitution and targeting citizens for their speech falls outside the scope of their lawful duties.

Page 42

140.    Each IRS employee or IRS top leader who labeled each DEFENDANT an illegal tax protester, a tax defier, or such other similar label has violated the First Amendment Rights of PEYMON and should be held in their individual capacities liable to each DEFENDANT for $1,000 for each time that they labeled either DEFENDANT as an illegal tax protester, tax defier, or a similar derogatory or stigmatizing term.

141.    Each IRS employee or IRS top leader Counterclaim Defendant utilized their federal authority under color of law in their individual capacities to punish, restrict, or stop PEYMON for PEYMON'S political and legal viewpoints, violating PEYMON'S clearly established First Amendment rights as described above and entitling PEYMON to damages at the rate of $1,000 for each occasion that each of them took an action to violate, curtail, or stop PEYMON's exercise of PEYMON's First Amendment Rights.

## COUNT II: Violation of RRA 1998 § 3707 and the Administrative Procedure Act (5 U.S.C. § 706) (Against Counterclaim Defendant United States of America)

142.    PEYMON incorporates paragraphs 35 through 137 by reference.

143.    Section 3707 of RRA 98 strictly prohibits the IRS from designating any taxpayer as an "Illegal Tax Protester" or utilizing any similar derogatory designation.

144.    The IRS has illegally maintained such labels within PEYMON's administrative files since at least 1994 and continues to do so to this day. This constitutes an agency action that is "arbitrary, capricious,

Page 43

an abuse of discretion, or otherwise not in accordance with law" under the Administrative Procedure Act, 5 U.S.C. § 706(2)(A).

145.    Each of the DEFENDANTS has suffered a legal wrong and has been adversely affected by this agency action of labeling DEFENDANTS as illegal tax protesters, tax defiers, or other such labels, entitling DEFENDANTS to equitable relief and an order compelling the IRS to permanently expunge these illegal designations about DEFENDANTS from all master files and internal IRS records.

## PRAYER FOR RELIEF ON THE COUNTERCLAIMS

WHEREFORE, Counterclaim Plaintiff Peymon Mottahedeh respectfully requests that this Court: A. Deny the relief requested in Plaintiff's Complaint and dismiss the Complaint with prejudice; B. Grant the relief requested in Count I and Count II of the Counterclaims; and C. Grant such other and further relief as the Court deems just and equitable.

## DEMAND FOR JURY TRIAL

Counterclaim Plaintiff hereby demands a trial by jury on all issues so triable.

Respectfully submitted this 15th day of May, 2026.

Peymon Mottahedeh
P.O. Box 10599
Brooksville, Florida 34603
Peymon@FreedomLawSchool.org
(760)964-5519

Page 44

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 15th day of May, 2026, the original of the foregoing Defendant Peymon Mottahedeh's First Amended Answer and Affirmative Defenses was physically delivered to the Clerk of the Court for filing.

I further certify that pursuant to Fed. R. Civ. P. 5(b)(2)(E) and the Middle District of Florida CM/ECF Administrative Procedures, upon the Clerk's docketing of this physical paper, the Court's CM/ECF system will automatically generate a Notice of Electronic Filing (NEF).

Because Plaintiff's counsel is a registered CM/ECF user, this NEF constitutes valid and instantaneous electronic service upon Plaintiff at the following address:

> Daniel B. Causey
> Trial Attorney, Civil Division
> Tax Litigation Branch
> U.S. Department of Justice
> Email: Daniel.B.Causey@usdoj.gov

Peymon Mottahedeh

Page 45